IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


ALKEBULAN, INC., *et al.*,

            **Plaintiffs,**


      vs.                            **Civil Action 2:13-cv-1249**
                                            **Magistrate Judge King**


CITY OF COLUMBUS, *et al.*,

            **Defendants.**


## OPINION AND ORDER

This is a civil rights action under 42 U.S.C. § 1983 in which plaintiffs, a corporation that sponsors the Juneteenth Festival in Columbus, Ohio, and its chief executive officer who organizes that event, allege that defendant Bela Bernhardt, a Lieutenant with the Columbus Police Department, improperly cancelled portions of the 2013 event, and that the fees associated with the event were nevertheless charged to plaintiffs.[1] As a result, plaintiffs allege, they have suffered personal loss and a deprivation of their rights under the First Amendment as well as their rights to due process and equal protection.  Plaintiffs also assert supplemental state law claims of

---

[1] Plaintiffs also originally claimed that they were deemed ineligible to apply for a permit for the 2014 Juneteenth Festival because they had not paid all fees owed in connection with the 2013 Juneteenth Festival, and that a permit for the 2014 Juneteenth Festival had been denied in retaliation for plaintiffs' complaints to city officials about the closing of the 2013 Juneteenth Festival. *Complaint*, ¶¶ 36-39. However, defendants offer uncontroverted evidence that the 2014 Juneteenth Festival was held on June 20-22, 2014, in a different venue. *Nicholson Affidavit*, ¶ 10. Plaintiffs do not dispute this fact, nor do they further address any claims in connection with the 2014 Juneteenth Festival. Defendants are therefore entitled to summary judgment on these claims and the Court will not further address these claims.

breach of contract and promissory estoppel.  Named as defendants are
the City of Columbus ("the City"), the City of Columbus Division of
Police, Lieutenant Bela Bernhardt, and the City of Columbus Department
of Recreation and Parks.[2] The City asserts a counterclaim for breach of
contract.  With the consent of the parties, *see* 28 U.S.C. § 636, this
matter is before the Court on *Defendants' Motion for Summary Judgment*,
ECF 17 ("*Motion for Summary Judgment*").  Plaintiff has filed a
response to the *Motion for Summary Judgment*, *Plaintiffs Alkebulan,
Inc. et al.'s Motion Contra Defendants' City of Columbus, Division of
Police, et al.'s Motion for Summary Judgment*, ECF 23 ("*Plaintiffs'
Response*"), and defendants have filed a reply, *Defendants' Reply to
Plaintiffs' Memorandum Contra Defendants' Motion for Summary Judgment*,
ECF 26 ("*Reply*").  For the reasons that follow, the *Motion for Summary
Judgment* is **GRANTED in part and DENIED in part**.

I.    BACKGROUND AND EVIDENCE OFFERED BY THE PARTIES

A person or organization wishing to use a Columbus public park
for a special event must apply for a "Special Events Permit."
*Affidavit of Jason T. Nicholson*, ¶ 2, attached as Exhibit A to the
*Motion for Summary Judgment* ("*Nicholson Affidavit*").[3]  A Special Events
Permit applicant who collects money in a city park must, among other
requirements, "hire a minimum of 1 police officer.  Columbus Police
will determine how many officers are required for [the] event." *City
of Columbus Special Events Application*, p. 3, attached as Exhibit A-1
to the *Nicholson Affidavit*.  Columbus Police Department officers who
are hired and paid by a third party to provide security at events,

---

[2] The *Complaint* erroneously refers to this defendant as the "City of Columbus
Department of Parks and Recreation."
[3] Mr. Nicholson is the Special Events Coordinator for the Columbus Department
of Recreation and Parks.  *Id.* at ¶ 1.

including festivals, are known as "special duty officers." *Affidavit of Lt. Bela A. Bernhardt*, ¶ 6, attached as Exhibit B to the *Motion for Summary Judgment* ("*Bernhardt Affidavit*"); *Affidavit of Sgt. Christopher Odom*, ¶ 4, attached as Exhibit D to the *Motion for Summary Judgment* ("*Odom Affidavit*"). A Special Events Permit applicant also accepts responsibility "to meet all city rules and regulations[.]" Exhibit A-1, p. 4. Once the application for a Special Events Permit is approved, the permit is issued. *Nicholson Affidavit*, ¶ 2.

Plaintiff Mustafaa Shabazz is the founder and Chief Executive Officer of plaintiff Alkebulan, Inc. ("Alkebulan"), a non-profit corporation with its principal place of business in Columbus, Ohio. *Complaint*, ECF 1, ¶¶ 4-5.[4] Alkebulan has been the primary sponsor of, and plaintiff Shabazz the organizer of, the Juneteenth Festival in Columbus, Ohio for the past twenty-three years. *Id.* at ¶¶ 12-13. The Juneteenth Festival is a cultural festival, commemorating June 19, 1865, "which is considered the date when the last slaves in America were freed in Texas." *Id.* at ¶ 12. Plaintiff Shabazz applied for a Special Events Permit in order to hold the Juneteenth Festival in Franklin Park, a large and unfenced area, on June 14, 15, and 16, 2013 ("the 2013 Juneteenth Festival"). *Nicholson Affidavit*, ¶ 5; Exhibit A-1, attached thereto ("2013 Special Events Application"); *Odom Affidavit*, ¶ 7; *Bernhardt Affidavit*, ¶ 17. His application was approved and a Special Events Permit was issued to plaintiff Shabazz

---

[4] The *Complaint* is not executed under penalty of perjury and therefore has no evidentiary value on summary judgment. *See id.*; *Bennett v. Schroeder*, No. 02-3562, 99 F.App'x 707, at *717 (6th Cir. May 27, 2004) ("[A]t the summary judgment stage after the close of discovery, Plaintiff can no longer simply rely on the allegations of his complaint; rather, he must present affirmative evidence supporting his allegations in order to withstand summary judgment.") (internal quotation marks omitted)). The Court includes these unverified but undisputed allegations regarding the identity of the plaintiffs and the description of the Juneteenth Festival simply for background purposes.

3

for the 2013 Juneteenth Festival. *Nicholson Affidavit*, ¶ 6; Exhibit A-2, attached thereto ("*2013 Special Events Permit*"). Hours of operation were from 1:00 p.m. to 9:00 p.m. on each of the three (3) days of the festival. *Incident Action Plan*, Exhibit 4, p. 2, attached to *Plaintiffs' Response*.[5]

Defendant Bernhardt prepared an *Incident Action Plan*, which addressed, *inter alia*, the security needs for the 2013 Juneteenth Festival. *Id*. Plaintiff Shabazz hired Columbus Police officers for the 2013 Juneteenth Festival, including thirteen to sixteen special duty officers who, wearing their Columbus Police Department uniforms, worked on June 15, 2013. *Id*. at 3; *Odom Affidavit*, ¶ 4. Sergeant Christopher Odom, who is African-American and who "previously worked at numerous festivals in Columbus, including the Juneteenth Festival," supervised these special duty officers. *Odom Affidavit*, ¶¶ 1, 3, 4, 9.

Approximately ten Gang Unit officers from the Columbus Police Department were also present on June 15, 2013. *Id.; Affidavit of Sgt. Chantay M. Boxill*, ¶ 7, attached as Exhibit C to the *Motion for Summary Judgment* ("*Boxill Affidavit*"). Sergeant Boxill, who is also African-American and who "worked every festival in Columbus since the summer of 2005, including, but not limited to, the Asian Festival, ComFest, the Juneteenth Festival, the Ribfest and the fair," supervised the Gang Unit officers.[6] *Boxill Affidavit*, ¶¶ 1, 5-7, 14;

---

[5] The 2013 Special Events Application identified the hours of operation for the festival as 6:00 a.m. to 11:00 p.m. for each of the three (3) days of the festival. *2013 Special Events Application*, p. 2.

[6] Sergeant Boxill has been in charge of the Columbus Police Department's Criminal Intelligence Unit, which includes the Gang Unit, since May 2005. *Boxill Affidavit*, ¶ 4.

*Bernhardt Affidavit*, ¶ 7.[7]

In addition, on-duty Columbus police officers set up a "command center" in the parking lot behind East High School, which is located on East Broad Street across from Franklin Park.  *Bernhardt Affidavit*, ¶ 8.  "The purpose of the command center was to have on-duty personnel available in case assistance was needed inside the park, and to respond to incidents that might occur outside the park."  *Id.* Defendant Bernhardt was in charge of on-duty and special duty officers who were working the 2013 Juneteenth Festival.  *Id.* at ¶¶ 1, 5.  On June 15, 2013, defendant Bernhardt was on duty for his regular shift and was the Incident Commander for the Juneteenth Festival.  *Id.* at ¶ 5.

Throughout the afternoon of Saturday, June 15, 2013, many known and suspected gang members were observed at the Juneteenth Festival, and a number of fights occurred, *Boxhill Affidavit*, ¶¶ 7, 8; *Odom Affidavit*, ¶ 5, resulting in "multiple uses of mace by special duty officers, the deployment of a Taser, and four arrests."  *Bernhardt Affidavit*, ¶ 9. Because of the fights that had occurred, "all of the Gang Unit officers changed from plain clothes into tactical gear. . . ." *Boxill Affidavit*, ¶ 7.

At approximately 7:00 p.m., a fifteen year-old gang member shot an eleven year-old boy in the leg ("the shooting").  *Id.* at ¶ 10; *Boxill Affidavit*, ¶ 9; *Odom Affidavit*, ¶ 5.  The shooting occurred near the Adventure Center in the middle of the 2013 Juneteenth

---

[7] In addition to these special duty officers and regular on-duty officers from the Columbus Police Department, plaintiff Shabazz provided approximately six private security officers.  *Bernhardt Affidavit*, ¶ 7.

Festival venue; the victim was not the shooter's intended target. *Id*. Approximately twenty uniformed police officers were within roughly 100 feet of the scene of the shooting and Sergeant Odom was approximately twenty yards from the scene. *Bernhardt Affidavit*, ¶ 11; *Boxill Affidavit*, ¶ 12; *Odom Affidavit*, ¶ 5. Fights broke out after the shooting, and more than 200 teenagers were removed from the park. *Boxill Affidavit*, ¶ 10; *Odom Affidavit*, ¶¶ 5-6.

Defendant Bernhardt arrived at the scene of the shooting between 7:02 p.m. and 7:04 p.m. *Bernhardt Affidavit*, ¶ 11. He spoke with Sergeant Boxill, who advised that the shooting was gang-related and that there would likely be retaliation the next day at the 2013 Juneteenth Festival. *Boxill Affidavit*, ¶ 11. Asked by defendant Bernhardt for her recommendation, Sergeant Boxill "recommended that the festival be shut down for the remainder of Saturday evening [June 15, 2013] and all day Sunday [June 16, 2013]." *Id*. Sergeant Boxill was of the opinion that "the public was at risk of harm if the festival remained open." *Id*. Specifically, she believed that "the fact that this shooting occurred inside the festival venue (and with numerous police officers in near proximity) increased the risk to festival attendees and vendors if it were allowed to remain open." *Id*. at ¶ 12.

Defendant Bernhardt also spoke with Sergeant Odom following the shooting. *Bernhardt Affidavit*, ¶ 15; *Odom Affidavit*, ¶ 6. Sergeant Odom likewise recommended that the 2013 Juneteenth Festival be closed for the remainder of July 15, 2013 and for the following day as well. *Odom Affidavit*, ¶ 6. Sergeant Odom based his recommendation on the violence that he had observed leading up to the shooting as well as on

statements of attendees heard by him before and after the shooting.
*Id.* Sergeant Odom concluded "that there would likely be retaliation
from a rival gang the following day. Gangs were also using
diversionary tactics such as fights in different locations to disperse
police." *Id.* Sergeant Odom also believed that the violence that he
had witnessed, coupled with the fact that the police could not control
who was coming into the large and unfenced Franklin Park venue, posed
a risk to attendees if the 2013 Juneteenth Festival were to open on
Sunday, June 16, 2013. *Id.*

Based on his training and experience as well as on the
recommendations of Sergeants Boxill and Odom, defendant Bernhardt
"believed that there was a high likelihood of gang retaliation" at the
2013 Juneteenth Festival on Sunday, June 16, 2013, placing the safety
of attendees and citizens near Franklin Park at risk. *Bernhardt
Affidavit*, ¶ 16. He also believed that "it would be impossible to
provide adequate security for the remainder of the festival[.]" *Id.*
According to defendant Bernhardt, "it would not matter how many police
officers were present if attendees were engaging in such brazen acts"
like the shooter's firing of a gun in near proximity to multiple
police officers. *Id.* Based on these concerns for the risk to public
safety, defendant Bernhardt decided to close the Juneteenth Festival
on Sunday, June 16, 2013. *Id.* at ¶ 18.

Plaintiffs acknowledge that, in addition to the special duty
officers and "because of past history, and the 'festival' being held
in the crossroads of gang activity," the City added 11 police
personnel to the security detail. *Plaintiffs' Response*, p. 2.
Moreover, plaintiffs do not dispute "[t]he facts surrounding the

7

'incidents' of fights and disturbances during the Juneteenth Festival which took place on Saturday, June 15, 2013. . . ." *Id*. However, plaintiffs have a "different perception of the 'actual violence' and severity of the violence . . . between what was observed by the Defendants and what actually occurred at the venue." *Id*. at p. 3. Plaintiffs take the position that defendants "overestimated" the danger to the public and characterize the closure of the 2013 Juneteenth Festival on Saturday as "an overreaction" to the shooting. *Id*. at pp. 6-7, 9. Moreover, they argue that the closure of the event on Sunday "was based solely on conjecture and speculation." *Id*. at 9. In support of their position, plaintiffs present the affidavits of a number of attendees at the 2013 Juneteenth Festival. For example, in the hour or two prior to the shooting, Eddie B. Sands, Jr., one of the performers at the Amphitheater, observed that "[t]he main stage had gospel music playing and a 'family atmosphere' existed." *See Affidavit of Eddie B. Sands, Jr.*, ¶ 4, attached as Exhibit 5 to *Plaintiffs' Response* ("*Sands Affidavit*"). Another observer confirms this "family atmosphere" near and around the Amphitheater and Adventure Center prior to the shooting. *See Affidavit of Michele Renee Hagans*, ¶¶ 2-3 (averring that she worked with the Health & Natural Hair Expo exhibit inside the Adventure Center; that she took breaks to view the crowd in front of the Adventure Center; and that crowds inside the Adventure Center were "mostly" "families"), attached as Exhibit 7 to *Plaintiffs' Response* ("*Hagans Affidavit*").[8]  Although

---

[8]Plaintiffs also proffer the *Affidavit of Phillip R. Coldwell*, which is attached to *Plaintiffs' Response* ("*Coldwell Affidavit*").  However, because

many youths engaged in horseplay, including around the Adventure Center, their behavior was not intimidating or threatening to volunteers. *Id.* at ¶¶ 5-6; *Affidavit of Ayran Johnson*, ¶¶ 3, 5, attached as Exhibit 8 to *Plaintiffs' Response* ("*Johnson Affidavit*"). *See also Sands Affidavit*, ¶¶ 3-4 (averring that, from his vantage as a performer on the Amphitheater stage, the crowd was "made up of adults and young adults and children in equal measure" and that "there were more adults than teenagers gathered" and that the crowd was "very warm and welcome to my performance"). Around the Amphitheater, there were no fights, no signs of panic, and no gang colors on display. *Sands Affidavit*, ¶¶ 3-4. At the time of and following the shooting, Mr. Sands observed that the crowd did not panic and that his audience remained in their seats. *Id.* at ¶¶ 5, 7. Another volunteer present when the shooting occurred observed no panic or hysteria following the shooting. *Johnson Affidavit*, ¶¶ 3-4. Plaintiff Shabazz denies that any police officer advised him that a concern for gang retaliation and public safety necessitated the closing of the 2013 Juneteenth Festival for the remainder of Saturday and all day Sunday. *See* sworn statement of Mustafaa Shabazz executed on April 8, 2015, pp. 1-2 ("*Plaintiff Shabazz's Declaration*").

Some of plaintiffs' affiants also offer their opinion that defendant Bernhardt's decision to end the 2013 Juneteenth Festival was racist. *See, e.g., Sands Affidavit*, ¶ 9 (averring "considerations of

---

the *Coldwell Affidavit* is unsigned and undated, *see id.* at PAGEID#:213, the Court will not consider its assertions. *See, e.g., Fox v. Mich. State Police Dep't*, No. 04-2078, 173 Fed. Appx. 372, at 375 (6th Cir. 2006) (affirming decision to disregard documents that "were neither sworn nor certified, were not properly authenticated and were therefore inadmissible in evidence").

race and color had some role in the decision" to close the 2013 Juneteenth Festival); *Shabazz Declaration*, ¶ 5 (averring that defendant Bernhardt's actions were "discriminatory, racist, unequal and unfair"); *Hagans Affidavit*, ¶ 7 ("I believe, know, and think that the Festival was shut down because it was an African American event"); *Johnson Affidavit*, ¶ 8 ("I believe that race was a factor in the premature termination of the Juneteenth Festival.")).

Some of these affiants also express their opinion that the law enforcement officers working the 2013 Juneteenth Festival were disengaged or were ineffective prior to the shooting. *See Hagans Affidavit*, ¶ 4 ("[P]olice did nothing to control the crowds to keep the younger crowds from congregating behind the main stage."), ¶ 6 (detailing an incident where nearby police officers failed to speak to or otherwise engage a group of teens engaged in horseplay); *Johnson Affidavit*, ¶ 5 ("[T]he police were outnumbered in the park. In my opinion, some officers appeared to be disengaged from their roles and/or duties at the festival.").

## II. STANDARD

The standard for summary judgment is well established. This standard is found in Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). In making this determination, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that

is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson,* 477 U.S. at 251.

The party moving for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Catrett,* 477 U.S. at 323. Once the moving party has met its initial burden, the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250 (quoting former Fed. R. Civ. P. 56(e)); *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir. 1995)("nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial"). "Once the burden of production has so shifted, the party opposing summary judgment cannot rest on the pleadings or merely reassert the previous allegations. It is not sufficient to 'simply show that there is some metaphysical doubt as to the material facts.'" *Glover v. Speedway Super Am. LLC,* 284 F. Supp.2d 858, 862 (S.D. Ohio 2003)(citing

11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Instead, the non-moving party must support the assertion that a fact is genuinely disputed.  Fed. R. Civ. P. 56(c)(1).

In ruling on a motion for summary judgment "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Glover*, 284 F. Supp.2d at 862 (citing *InteRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989)).  Instead, a "court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties."  *Id*.  *See also* Fed. R. Civ. P. 56(c)(3).

### III.  CLAIMS AGAINST COLUMBUS DIVISION OF POLICE AND COLUMBUS DEPARTMENT OF RECREATION AND PARKS

The parties agree that the claims against the Columbus Division of Police and Columbus Department of Recreation and Parks should be dismissed.  *Motion for Summary Judgment*, pp. 6-7; *Plaintiffs' Response*, p. 5; *Reply*, p. 1.

### IV.  FIRST AMENDMENT CLAIMS

Plaintiffs allege that their rights under the First Amendment were violated when the 2013 Juneteenth Festival was closed. *Complaint*, ¶¶ 31-37.  Plaintiffs specifically allege that the "closure of the Juneteenth Festival was undertaken for the express purpose of preventing a group of primarily African-American individuals from peaceably assembling[.]"  *Id*. at ¶ 37.

The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech, . . . or the right of the people peaceably to assemble[.]"  U.S. Const. amend. I.  The freedoms guaranteed by the First Amendment are, of course, protected by the Fourteenth Amendment from invasion by state and local governments. *Edwards v. South Carolina,* 372 U.S. 229, 235 (1963)(and cases cited therein). Courts considering free speech claims[9] under the First Amendment employ a three-step analysis.  *See*, *e.g.*, *Saieg v. City of Dearborn*, 641 F.3d 727, 734 (6th Cir. 2011) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).  "The first step is to determine whether the plaintiff's conduct is protected speech."  *Id.* "The second step is to identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic."  *Id.* (internal quotation marks omitted).  Finally, the third step of the analysis examines "'whether the justifications for exclusion from the relevant forum satisfy the requisite standard.'"  *Saieg*, 641 F.3d at 735 (quoting *Cornelius*, 473 U.S. at 797).

In the case presently before the Court, defendants concede for purposes of summary judgment that plaintiffs were engaged in protected

---

[9] Like the constitutional right to freedom of speech, the constitutional right to freedom of assembly is limited by the government's right to impose proper considerations of time, place, and manner. *Cox v. Louisiana,* 379 U.S. 536, 558 (1965); *Cox v. State of New Hampshire*, 312 U.S. 569, 576 (1941). The Court will therefore not separately analyze plaintiffs' claims based on the constitutional guarantees of freedom of assembly. *See International Soc. for Krishna Consciousness, Inc. v. Evans*, 440 F.Supp. 414, 421 (S.D. Ohio 1977).

speech.  *Motion for Summary Judgment*, p. 8.  Defendants contend that the venue, Franklin Park, is a public forum upon which the government may impose restrictions.  *Id*.  Plaintiffs do not specifically address the character of the forum, but concede that some restrictions may be imposed in the forum.  *Plaintiffs' Response*, pp. 6-7.

The forum in this case is the City's Franklin Park, a traditional public forum.  *See*, *e.g.*, *Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834, 842 (6th Cir. 2000) ("Traditional public fora, such as streets, sidewalks, and parks, are places which by long tradition or by government fiat have been devoted to assembly and debate.") (internal citations omitted).  The type of restriction at issue, whether content-based or content-neutral, determines the level of scrutiny applied in a traditional public forum.  *See*, *e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). A content-based restriction may be enforced only if it is shown to be "necessary to serve a compelling state interest . . . that is narrowly drawn to achieve that end."  *Id.* at 45.  On the other hand, content-neutral "time, place, and manner" restrictions are enforceable if they "are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Id.*  *See also Saieg*, 641 F.3d at 734 ("If a rule is 'content-neutral, [then] the appropriate test is intermediate scrutiny,' even when the rule governs speech in a traditional public forum.") (quoting *Phelps-Roper v. Strickland*, 539 F.3d 356, 361-62 (6th Cir. 2008)).

**Content-neutrality**

14

"Government regulations of speech are content neutral if they are 'justified without reference to the content or viewpoint of the regulated speech.'" *Id.* at 735 (quoting *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 696 (2010)). *See also Hill v. Colorado*, 530 U.S. 703, 719 (2000) ("The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.") (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (internal quotation marks and emphasis omitted).

In this case, a City ordinance authorizes "any law enforcement officer [to] close or restrict to public use and evacuate a park, facility or area when necessitated by reason of and in the interest of the public health, safety, welfare, maintenance or any other reasons deemed necessary for the public interest." Columbus, Ohio Code of Ordinances ch. 919, § 919.05(B) (eff. 7/18/11) ("the ordinance"). Neither party argues that the ordinance regulates the use of parks based on the type of speech at issue. The ordinance does not seek to exclude or limit the use of its parks based on the content of messages or on the substance of viewpoints. Similarly, the City's interest in, *inter alia*, public safety does not refer to the content of speech. *See*, *e.g.*, *Ward*, 491 U.S. at 791 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."). The Court therefore concludes that the ordinance is content neutral on its face.

**<u>Narrowly tailored to serve a significant government interest</u>**

"To be narrowly tailored, a restriction on speech must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Bays v. City of Fairborn*, 668 F.3d 814, 821 (6ᵗʰ Cir. 2012)(quoting *Ward*, 491 U.S. at 799). Although a restriction "'may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the [City's] goal,' it must not be 'substantially broader than necessary.'" *Id.* (quoting *Hill*, 530 U.S. at 726 and *Ward*, 491 U.S. at 800) (internal citations omitted). *See also Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002) ("Even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression.").

In the case presently before the Court, plaintiffs do not argue that the ordinance is itself unconstitutional. Indeed, plaintiffs agree that the ordinance "allows the police to close the park [Franklin Park] in the interest of public safety." *Plaintiffs' Response*, p. 6. Clearly, cities and states have a significant interest in public safety. *See, e.g., Saieg*, 641 F.3d at 736 (stating that, "[i]n appropriate contexts," threats to public safety, *inter alia*, "can be [a] substantial" interest); *American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 612 (6th Cir. 2005) (recognizing a city's significant interest in, *inter alia*, public safety).

However, "[t]he defendants must do more . . . than 'assert [] interests [that] are important in the abstract.'" *Saieg*, 641 F.3d at

16

736-37 (quoting *Turner Broad Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994)).  The interest or interests must be "real" as opposed to "conjectural."  *Id*. at 737.  "'Mere speculation about danger' is not an adequate basis on which to justify a restriction of speech."  *Id*. at 739 (quoting *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1228 (9th Cir. 1990)).

Plaintiffs do not disagree that violence occurred in the festival venue on the evening of Saturday, June 15, 2013; they argue that the decision to close the festival for the remainder of Saturday was "an overreaction to one event that disrupted an otherwise peaceful festival" and that the decision to close the festival for the entire next day was "based upon pure conjecture that because an isolated instance of violence occurred on Saturday then it would automatically roll over to Sunday." *Plaintiffs' Response*, p. 9.

> . . . [N]o more than three shots were fired at the festival and only one (1) shot hit a victim. The [police] report demonstrates the victim was not the intended victim of the shooting by the shooter, . . . There is no evidence in the report that the intended victim . . . was shot even though . . . the intended target [ ] was never hit by [the shooter's] gunshots. Furthermore, the shooter was apprehended within minutes of the shooting, discarded his gun, and attempted to blend into the crowd at the pavilion. Nothing in the report indicates scattered gunshots, hostages being taken, or the general public being in danger. The violence the Defendants' spoke to was an isolated incident that involved two (2) juveniles and a juvenile that was mistakenly shot. The shooting was brought under control quickly and despite police assessments of continued violence there is no record of this occurring.

*Plaintiffs' Response*, p. 7.

This Court disagrees with plaintiffs' contention that the decision to close the remainder of the 2013 Juneteenth Festival was an overreaction based on mere conjecture and speculation as to the danger

posed to the public. First, the evidence of disturbances throughout the day and prior to the shooting - including the use of mace and a Taser, a number of arrests, and police officers needing to change from plain clothes to tactical gear - is uncontroverted by plaintiffs.[10] Furthermore, the observations of lay persons untrained in gang activity and crowd control, and based on very narrow vantages of observation, shed little light on and offer even less insight into the significance of the events that indisputably occurred throughout Franklin Park on Saturday. It is uncontroverted that defendant Bernhardt's decision to shut down the remainder of the 2013 Juneteenth Festival was based not only on his own observations and experience, but also on the recommendations of Sergeants Boxill and Odom, African-American police officers of long service and training, who concluded that to permit the festival to continue would pose a risk of harm to the attendees and vendors. Defendant Bernhardt explained that the interest of public safety required the closure of the festival even on Sunday:

> [I]t was the opinion of the gang unit . . . that this was
> more . . . likely than not a gang-related shooting; and in
> gang-related shootings, there is a high probability of a
> retaliatory attack.
> With the knowledge of having the same event where the same
> group of individuals would be allowed to congregate, we
> would be giving them the opportunity to have that
> availability for retaliation.

*Deposition of Bela A. Bernhardt*, pp. 26-27, ECF 22 ("*Bernhardt Deposition*").

---

[10] The *Progress of Investigation*, Exhibit 3 attached to *Plaintiffs' Response*, relates only to the investigation of the shooting, and cannot be read as evidence that no other incidence of violence occurred at the 2013 Juneteenth Festival.

Based on the uncontroverted evidence presented, this Court concludes that the decision to close the 2013 Juneteenth Festival was "narrowly tailored," and was not "'substantially broader than necessary'" to further the City's legitimate interest in assuring the safety of the public. *See Bays*, 668 F.3d at 821 (quoting *Hill*, 530 U.S. at 726 and *Ward,* 491 U.S. at 800).

### **Alternative channels of communication**

Having determined that the decision to close the remainder of the 2013 Juneteenth Festival was narrowly tailored and not substantially broader than necessary to serve the City's legitimate interest in protecting the public, the Court must also consider whether that decision provided alternative channels of communication to plaintiffs. *See Ward*, 491 U.S. 791. Under the facts of this case, consideration of the "narrowly tailored" element of the First Amendment analysis is closely intertwined with the "alternative channels of communication" element of the analysis. Plaintiffs seem to suggest that, in order to satisfy this element, defendants were obligated to keep the festival open. *See Plaintiffs' Response*, p. 9. Defendant Bernhardt testified that he considered – but rejected – the possible reopening of the festival on Sunday. First, it was unclear whether plaintiffs could hire additional special-duty officers on such short notice. *Bernhardt Deposition*, p. 36. Moreover, the unsecured venue selected by plaintiffs, which permitted unrestricted access to the festival, rendered security particularly difficult. *Id*. pp. 36-37. Sergeant Odon advised defendant Bernhardt following the shooting that the venue

could not be secured. *Id.* p. 36. Even increasing the number of police personnel could not assure the safety of attendees:

> [W]hen an incident is able to be done in the presence of 20 uniformed officers, that brazen of an act, I don't know what number you would have to give me to tell me enough officers would be there.

*Id.* In short, having concluded that the closing of the remainder of the 2013 Juneteenth Festival was narrowly tailored to further the City's legitimate interest in assuring the safety of the public, and was not substantially broader than necessary to serve that interest, the Court also concludes that keeping the festival open was not a viable alternative channel of communication.

However, it cannot be overlooked that the 2013 Juneteenth Festival was intended to run for three (3) days and in fact lasted almost two full days. Under the particular facts of this case, this Court is persuaded that the decision to close the remainder of the 2013 Juneteenth Festival did not impermissibly foreclose plaintiffs' channels of communication.

## V. FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS CLAIM

The *Complaint* asserts a claim of denial of procedural due process in violation of the Fourteenth Amendment to the United States Constitution and specifically invokes "a vested property interest in operating all three days of the Juneteenth event." *Complaint*, ¶ 45.[11] Defendants challenge plaintiffs' claim to a constitutionally protected property interest arising from the issuance of the special events

---

[11] The *Complaint* also refers in passing to the Fifth Amendment but does not otherwise invoke this amendment. *See id.* Accordingly, the Court presumes that plaintiffs intend to assert their claims against these non-federal defendants under only the Fourteenth Amendment.

permit and contend that, in any event, plaintiffs have not shown that the City failed to provide adequate post-deprivation remedies. *Motion for Summary Judgment*, pp. 10-12.

*Plaintiffs' Response* does not address the procedural due process claim asserted in the *Complaint*. *See generally Plaintiffs' Response*. Where plaintiffs rest on the allegations in the unverified *Complaint* and have failed to come forward with evidence or specific facts showing a genuine issue of material fact, summary judgment is appropriate. *See*, *e.g.*, *Anderson,* 477 U.S. at 250 ("[W]hen a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'") (quoting former Fed. R. Civ. P. 56(e); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989) ("In other words, the movant could challenge the opposing party to 'put up or shut up' on a critical issue. After being afforded sufficient time for discovery . . . if the respondent did not 'put up,' summary judgment was proper.").

In the absence of any apparent intent on plaintiffs' part to pursue this claim, the Court concludes that plaintiffs have abandoned their procedural due process claim.

## VI.  FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIM

Plaintiffs allege that defendants violated their rights under the Equal Protection Clause when defendants shut down the 2013 Juneteenth Festival. *Complaint*, ¶ 50.  The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S.

Const., amend. XIV, Sec. 1.  In order to prevail on an equal protection claim, "a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011).  Suspect classifications subject to heightened scrutiny include classifications based on race.  *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 503 (6th Cir. 2007).

The three officers who participated in the decision to close the festival, two of whom are themselves African-American, expressly deny that the closure of the 2013 Juneteenth Festival was based on considerations of race. *Bernhardt Affidavit*, ¶¶ 1-2, 14-18, 20-21; *Boxill Affidavit*, ¶¶ 1-5, 10-14; *Odom Affidavit*, ¶¶ 1-3, 6-9. Rather, the decision reflected their considered opinions that it would be impossible to provide adequate security, no matter the number of police officers present, throughout the remainder of the 2013 Juneteenth Festival.  *Bernhardt Affidavit*, ¶ 16; *Odom Affidavit*, ¶ 7. *Cf. Boxill Affidavit*, ¶¶ 11-12.

In response, plaintiffs offer the affidavits of certain participants in the 2013 Juneteenth Festival, who aver that the decision to close the festival was motivated by race. *Sands Affidavit*, ¶ 9; *Shabazz Declaration*, ¶ 5; *Hagans Affidavit*, ¶ 7; *Johnson Affidavit*, ¶ 8. In the view of this Court, these affidavits – which are wholly conclusory and unsupported by any factual assertion or

corroboration - are insufficient to establish a claim of race discrimination.

However, plaintiffs also characterize defendants' decision as based on race "because in similar situations non-African-American cultural events were not closed." *Plaintiffs' Response*, pp. 9-11. The Court construes this allegation as asserting an equal protection claim based on selective enforcement of the ordinance authorizing the closure of city parks because of, *inter alia*, threats to public safety. "In order to make out an equal protection claim on the basis of selective enforcement, a plaintiff must demonstrate that someone similarly situated but for the illegitimate classification used by the government actor was treated differently." *Boone v. Spurgess*, 385 F.3d 923, 932 (6th Cir. 2004).

In support of this claim, plaintiffs point to the 2012 Asian Festival, which was also held at Franklin Park. *See Exhibit 9*, attached to *Plaintiffs' Response*. Apparently, "500-1000 gang members/trouble makers . . . had made their way into the park and were fighting." *Id*. at PAGEID#: 252. The 2012 Asian Festival was shut down for the evening and the "troublemakers" were escorted out of the park. *Id*. "[S]everal shots rang out" as the crowd "made it north of the park." *Id*. "Two handguns were recovered at the scene and 3 persons were tak[en] into custody." *Id*. Apart from an injury suffered by a police officer during a foot chase, "[t]here were no other injuries inside the park with any other festival participants." *Id*. The festival resumed the following day. *Id*. At the time, police personnel attached significance to the fact that "[w]e were very lucky to not

23

have this gunfire occur inside the park during the festivities." *Id.* at PAGEID#: 253.

Of course, this was not the case with the 2013 Juneteenth Festival, which involved not only a shooting within the venue but also serious injury to a bystander. This incident, defendant Bernhardt avers, "was a much more serious matter and caused much greater security concerns for the safety of the public." *Bernhardt Affidavit*, ¶ 21. Because of this distinction, defendants contend that the 2013 Juneteenth Festival cannot properly be compared to the 2012 Asian Festival. This Court agrees and concludes that defendants are entitled to summary on this claim.

**VII. QUALIFIED IMMUNITY**

Defendant Bernhardt claims the protections of the doctrine of qualified immunity in defense against plaintiffs' constitutional claims. *Motion for Summary Judgment*, pp. 14-16; *Reply*, p. 8. This defense provides that "'governmental officials performing discretionary tasks generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Meyers v. City of Cincinnati*, 979 F.2d 1154, 1156 (6th Cir. 1992) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). There are two elements in a qualified immunity analysis: whether "the facts alleged show the officer's conduct violated a constitutional right," and whether that right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). A court may address either element first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Because the

24

Court has concluded that defendant Bernhardt is entitled to summary judgment on plaintiffs' constitutional claims, the Court need not further consider the issue of qualified immunity.

## VIII. MUNICIPAL LIABILITY

Plaintiffs assert claims against the City under a theory of municipal liability. *Complaint*, ¶¶ 52-56. A governmental entity cannot be held liable under § 1983 on the theory of *respondeat superior* simply because its employees allegedly engaged in unconstitutional conduct. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. Because the Court has concluded that defendants are entitled to summary judgment on plaintiffs' constitutional claims, the Court need not further consider the issue of municipal liability.

## IX. BREACH OF CONTRACT CLAIM

Plaintiffs assert a claim of breach of contract based on the 2013 Special Events Permit, the decision to shut down the 2013 Juneteenth Festival, and the alleged failure to provide adequate security for that event. *Complaint*, ¶¶ 61-65. The parties do not disagree that Ohio law governs plaintiffs' breach of contract claim. *See also Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992) (stating that Ohio's choice of law rules require that contracts be interpreted according to the "law of the place of the contract's

making"). In order to establish a breach of contract under Ohio law, "a plaintiff must show that a contract existed, the plaintiff performed, the defendant breached, and the plaintiff suffered damages." *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006) (citing *Wauseon Plaza Ltd. P'ship v. Wauseon Hardware Co.*, 156 Ohio App. 3d 575, 807 N.E.2d 953, 957 (Ohio Ct. App. 2004)).

In moving for summary judgment on this claim, defendants deny that the 2013 Special Events Permit constituted a contract. *Motion for Summary Judgment*, p. 17. This argument is disingenuous in light of the City's counterclaim for breach of contract based on the same 2013 Special Events Permit. *See Answer and Counterclaim*, pp. 8-11 (citing *Exhibit A* (2013 Special Events Permit), attached thereto).[12] *See Rayess v. Educ. Comm. for Foreign Med. Graduates*, 134 Ohio St. 3d 509, 513 (Ohio 2012) ("'Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.'") (quoting *Kostelnik v. Helper*, 96 Ohio St.3d 1, 3 (Ohio 2002)). Defendants also argue that, even assuming the existence of a contract, there was no breach of that contract because the City's obligation (*i.e.*, providing security adequate to protect public safety) became "impossible" in the aftermath of the shooting. *Motion for Summary Judgment*, pp. 17-18; *Reply*, pp. 8-9.

This Court concludes that there exists a genuine issue of material fact on this claim. Although defendants argue that, once the

---

[12] The City did not move for summary judgment on its counterclaim, which remains pending.

26

shooting occurred, securing the venue became impossible, the *Motion for Summary Judgment* does not address plaintiffs' claim that defendants acted in breach of the parties' contract by failing to "provide a security plan that determined the number of police officers needed." *Complaint*, ¶ 63. Accordingly, summary judgment in favor of defendants on plaintiffs' breach of contract claim is unwarranted.[13]

## X. PROMISSORY ESTOPPEL CLAIM

Plaintiffs also assert a claim for promissory estoppel based on the 2013 Special Events Permit, the decision to shut down the 2013 Juneteenth Festival, and the alleged failure to provide adequate security for that event. *Complaint*, ¶¶ 57-60. However, "Ohio law is clear that a plaintiff may not recover under the theory of unjust enrichment or quasi-contract when an express contract covers the same subject." *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 799 (6th Cir. 2009) (quoting *Lehmkuhl v. ECR Corp.*, No. 06 CA 039, 2008-Ohio-6295, at ¶ 55 (Ohio Ct. App. Dec. 2, 2008)). *See also Olympic Holding Co., L.L.C. v. Ace Ltd.*, 122 Ohio St. 3d 89, 96 (Ohio 2009) ("The doctrine of promissory estoppel comes into play where the requisites of contract are not met, yet the promise should be enforced to avoid injustice.") (internal quotation marks and citations omitted); *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335 (Ohio 1954) (" It is generally agreed that there cannot be an express agreement and an implied contract for the same thing existing at the same time."). Because the 2013 Special Events Permit, which underlies plaintiffs' breach of

---

[13] The *Complaint* asserts the breach of contract claim against "[d]efendants." *Complaint*, ¶ 62. Although the Court has reservations as to whether such a claim is properly asserted against defendant Barnhardt, defendants do not present an argument on that basis.

contract claim, covers the same subject, plaintiffs may not also recover on a theory of promissory estoppel. Defendants are therefore entitled to summary judgment on this claim.

**WHEREUPON**, *Defendants' Motion for Summary Judgment*, ECF 17, is **GRANTED in part and DENIED in part**. Specifically, as it relates to all claims except plaintiffs' breach of contract claim against the defendant City and defendant Barnhardt, the motion is **GRANTED**. As to those claims, *Defendants' Motion for Summary Judgment*, ECF 17, is **DENIED**.

The counterclaim asserted by the City of Columbus also remains pending.

September 22, 2015                    *s/Norah McCann King*
                                      Norah M<sup>c</sup>Cann King
                                      United States Magistrate Judge

28